IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| DANIEL ANGE, <br> Institutional ID No. 2326318, <br><br> Plaintiff, <br><br> v. <br><br> DPS OFFICER TX STATE TROOPER <br> CASH, *et al.*, <br><br> Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | CIVIL ACTION NO. 5:20-CV-240-BQ |

## **REPORT AND RECOMMENDATION**

Proceeding pro se and *in forma pauperis*, Plaintiff Daniel Ange filed this action under 42 U.S.C. § 1983, claiming violations of his constitutional rights during and after his September 27, 2019, arrest. Compl. 3–4, ECF No. 1.[1] Ange filed his Complaint on October 6, 2020, and the United States District Judge transferred this case to the undersigned United States Magistrate Judge for further proceedings. ECF Nos. 1, 5. The undersigned thereafter reviewed Ange's Complaint, as well as authenticated records from Texas Department of Public Safety (DPS) and Lubbock County, and ordered Ange to complete a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976).[2] ECF No. 10. Ange completed and returned the questionnaire. ECF No. 27.

Not all parties have consented to proceed before the undersigned magistrate judge. In accordance with the order of transfer, the undersigned makes the following Report and

---

[1] Page citations to Ange's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

[2] The Court did not find it feasible to hold a hearing in accordance with *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985) due to the COVID-19 pandemic.

recommends that the district judge order DPS Trooper Michael Sims to answer or otherwise plead to Ange's excessive use of force claim. Further, the undersigned recommends that the district judge dismiss with prejudice all other claims asserted by Ange in accordance with 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

### I. Standard of Review

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly fanciful or baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005). When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire or testimony given during an evidentiary hearing are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II. Discussion

### A. Ange's claims and the authenticated records.

Ange asserts claims against two Defendants: DPS Trooper Michael Sims,[3] and DPS Special Agent Robert Smith. Compl. 1, 3; Questionnaire 1. Ange alleges that Trooper Sims used excessive force during Ange's September 27, 2019, arrest. Compl. 4; Questionnaire 2–4. The authenticated records reflect that while on patrol at approximately 9:00 p.m., Trooper Sims and Agent Smith observed Ange commit traffic violations while operating a bicycle—disregarding a stop light and operating a bicycle without a rear light. *See* Questionnaire 2, 4; Compl. 4. When the officers attempted to stop Ange for the infractions, he fled on his bicycle. Questionnaire 6; BWC 0:10–:57.[4] Trooper Sims directed Ange to stop at least six times, but Ange continued to evade. BWC 0:10–:57.

---

[3] In his Complaint, Ange names DPS Trooper "Cash." Compl. 1, 3. In his questionnaire responses, however, Ange states that he has no reason to dispute authenticated records showing that Trooper Sims was involved in the incident. Questionnaire 1, ECF No. 27. The Court therefore refers to Defendant as Trooper Sims.

[4] In response to the Court's order, DPS submitted several videos related to the September 27 incident. The video that most clearly captures the purported use of force is Trooper Sims's body-worn camera footage, which is file-stamped as "Michael Sims_20190927_08_59_WFC1-054442_Criminal Felony_77003557." Citations to this footage are indicated as "BWC," while Sims's body-worn camera footage during Ange's transport to the hospital is denoted as "BWC2" (denoted as file "Michael Sims_20190927_10_49_WFC1-054442_UNCATEGORIZED_77003559"). Finally, interview room video citations are reflected as "IR."

3

Ange claims that Trooper Sims then "hit [him] with the front driver side of [Sims's] SUV in an attempt to stop [Ange]." Questionnaire 2; *see id.* at 6 (denying that Trooper Sims pulled his vehicle ahead of Ange, resulting in Ange striking Sims's vehicle). According to Ange, Trooper Sims "hit [him] so hard [he] was knocked off [his] bike 10–12 ft" (*id.* at 2); however, the video clearly refutes this allegation. BWC 0:56–1:06. Instead, the video shows Ange fell to the ground not more than a few feet from Sims's vehicle. *Id.* Further, Ange asserts that Trooper Sims "ran over [Ange's] bike to the point that another officer had to stand on it while the SUV was backed up to dislodge it from the driver front fenderwell [sic]." Questionnaire 2. Ange contends that as a result of the incident, his "left humerus ripped thru [sic] [his] skin," and he now "lose[s] feeling in [his] left arm" and has "continuous severe back pains." Compl. 4; Questionnaire 2, 4.

Trooper Sims's body-worn camera footage reflects that while on-scene, Sims asked Ange whether he had any injuries as a result of the incident. BWC 13:25–14:20. Ange stated that his stomach and back hurt; Trooper Sims also noted a laceration to Ange's elbow. *Id.* Later, Trooper Sims cleaned and applied gauze to the laceration before placing Ange in the patrol vehicle. BWC 26:10–31:20. Ange asserts, and authenticated records reflect, that Trooper Sims then took Ange to the DPS regional office, where Agent Smith intended to interview Ange. *See* Compl. 4. Although Ange contends that the officers failed to provide him medical care for several hours, the video footage directly belies this allegation. BWC 0:54–45:40; IR 21:54:30–22:14:30. Moreover, Ange concedes that he did not request treatment from the officers until "the conclusion of the interview."[5] Questionnaire 7–8, 11–13. Ange similarly acknowledges that it was not until they

---

[5] The video shows that almost immediately upon entering the interview room, Agent Smith noticed Ange's injury and determined that Ange required further medical care. IR 21:52:26–22:06:30. Although Agent Smith may have talked with Ange while they were waiting for emergency medical services (EMS) to arrive, Agent Smith did not formally interview Ange. *Id.* As discussed below, Agent Smith formally interviewed Ange during transport to the hospital. BWC2 0:02–13:20.

were at the office that Agent Smith noticed that Ange was still bleeding from his elbow and Smith determined Ange required additional medical treatment. *Id.* at 7, 13.

The interview room video reflects that Agent Smith inspected Ange's elbow at approximately 9:52 p.m., when Smith removed Ange's handcuffs, and thereafter officers called EMS. IR 21:52:26–22:06:30. EMS arrived at approximately 10:09 p.m. and assessed the laceration on Ange's elbow. IR 22:09:58–:14:30. EMS determined that while the injury was non-emergent, the laceration required stitches and that Ange needed treatment at the hospital. *Id.* After discussing his options with EMS, Ange signed a form waiving transport via ambulance, instead electing to have Trooper Sims and Agent Smith transport him. IR 22:09:58–:22:06. This video footage contradicts Ange's pleadings, where he claims that he "was told if [he] refused to go on ambulance [he would] maybe be released." Compl. 4; *see* Questionnaire 7 ("[A]fter the pep talk which lead [sic] me to believe I'd be released if I rode to [the hospital with the officers] rather then [sic] the ambulance I was taken to the hospital."), 9 (averring that he "refused to go with [EMS] opting to ride with the officers trying to comply with their every wish in hopes of being released").

During transport, the video reflects that Agent Smith questioned Ange. BWC2 0:02–13:20. Once they arrived at University Medical Center (UMC), Ange received medical treatment. BWC2 15:30–1:40:13. Ange alleges that Lubbock County Detention Center (LCDC) never filled the prescriptions for medications written by UMC, but he does not name any LCDC officials as defendants. *See* Compl. 1, 3–4. Moreover, Ange acknowledges that he did not ask LCDC to fill the prescriptions or submit any other medical requests to LCDC, nor does he aver that he suffered any harm as a result of not receiving the medication. Questionnaire 11. Ange seeks monetary damages for the alleged constitutional violations. Compl. 4.

5

**B. Ange has failed to state a claim for deliberate indifference to his serious medical needs.**

The Constitution requires that prison officials provide adequate medical care.[6] *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate or detainee seeking to establish a Fourteenth Amendment violation in regard to medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991))). Deliberate indifference "is an extremely high standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks and citation omitted)) and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). As to the subjective component, an official acts with deliberate indifference only where he (1) "knows [the] inmate[] face[s] a substantial risk of serious harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating that prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

---

[6] Because Ange was an arrestee or detainee at the time of his claim, his rights derive from the Fourteenth Amendment, not the Eighth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (stating that pretrial detainee's rights "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment"). Nevertheless, the standard for deliberate indifference to serious medical needs is essentially the same for both pretrial detainees and post-conviction prisoners; thus, cases applying the Eighth Amendment are still relevant to the Court's analysis.

An official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (alterations and internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 838). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). In sum, an inmate must demonstrate that prison staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

Ange has failed to plead facts sufficient to state a viable deliberate indifference claim. Ange's assertion that Trooper Sims or Agent Smith should have immediately obtained treatment

for him based on the alleged force incident, standing alone, does not demonstrate that the officers knew of and disregarded an excessive risk of harm. To the contrary, Ange concedes that he did not initially ask for medical care or otherwise communicate any specific facts to either officer concerning his purported injuries. Questionnaire 7 (stating he could not remember whether he asked the officers for medical care but maintaining the fact that he was involved in "an auto accident" triggered a "responsibility to pursue treat[ment]"), 13 (averring that he asked Agent Smith for medical treatment "at the conclusion of the interview"). In addition, the video shows that following the force incident, Ange was able to move and communicate with the officers. BWC 0:54–45:30. And, upon noticing the laceration on Ange's arm, Trooper Sims provided basic care on-scene. BWC 26:10–31:20. Moreover, once the officers realized the extent of his injury (after transporting Ange to the DPS regional office), Agent Smith promptly obtained additional care for Ange. Questionnaire 7–8 (explaining that when Agent Smith noticed blood on the sleeve of his hoodie, Smith performed a "physical . . . in which it was determined [Ange] was obviously injured prompting them to eventually call 911"), 9 (stating that UMC medical personnel stitched the wound on his left arm).

In sum, Ange pleads no facts demonstrating that the officers, immediately following the incident and prior to either providing or obtaining medical care, were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and in fact drew that inference. As a result, Ange fails to state a viable claim in this regard. *See, e.g., Hines v. Henson*, 293 F. App'x 261, 263 (5th Cir. 2008) (explaining that detainee failed to allege a constitutional claim where he did not "show that he complained of his condition or requested medical assistance, nor [did] he offer[] evidence showing that his medical condition was apparent and clearly necessitated medical care"); *Estrada v. Nehls*, 524 F. Supp. 3d 578, 591–92 (S.D. Tex. 2021)

(rejecting prisoner's deliberate indifference claim based on allegation that nurse provided only cursory medical care, where prisoner, though he claimed being in pain, did not allege facts showing that (1) nurse "was aware of facts from which an inference could be made that he required more than the medical care he was provided" and (2) she "drew the inference that [prisoner] faced a substantial risk of serious harm and disregarded that risk"); *Guillory v. La. Dep't of Health & Hosps.*, No. 16-787-JWD-RLB, 2018 WL 1404277, at *12 (M.D. La. Mar. 20, 2018) (dismissing prisoner's claim against nurse, where although he alleged he reported significant pain and difficulty breathing, prisoner pleaded "no facts to indicate that [nurse] actually drew an inference of substantial serious risk of harm and then denied [prisoner's] request for a transfer to the hospital in the face of that risk").

Construing Ange's claim as one for a delay in medical care requires no different result. Initially, the Court observes that although Ange alleges that Trooper Sims and Agent Smith denied him medical treatment for several hours (Compl. 4; Questionnaire 9), the video clearly refutes Ange's contention. Trooper Sims's body-camera footage does not contain timestamps, but the Court has deduced the following timeline based on all video provided: (1) the purported use of force incident occurred at approximately 9:00 p.m. (BWC 0:54–:59); (2) Trooper Sims cleaned and applied gauze to Ange's wound on-scene at around 9:27 p.m. (BWC 26:10–31:20); (3) Agent Smith directed officers to call EMS at roughly 9:54 p.m. (IR 21:54:30–:54:42); and (4) at approximately 10:09 p.m., EMS arrived and assessed the laceration on Ange's elbow. IR 22:09:58–:14:30.[7] Thus, the video footage shows that EMS examined Ange approximately

---

[7] The Court has approximated the start-time of the purported force based on the length of Trooper Sims's body-camera footage, which is about forty-five minutes total. The incident involving Trooper Sims occurs at the 0:56 second mark, and the video concludes at the 45:40 mark, when Trooper Sims and Ange arrive at the DPS office. Video footage from the interview room contains timestamps and shows that at 9:49:56 p.m., Ange enters the room with Agent Smith. Shortly thereafter, at approximately 9:52:56 p.m., Agent Smith observed Ange's injury and determined that officers needed to call EMS. Thus, in less than sixty minutes from the time of the initial incident, the officers called EMS for additional medical care. Further, the Court observes that at the beginning of Trooper Sims's body-camera footage

one-hour after the initial injury and, at the advice of EMS, the officers subsequently took Ange to the hospital. IR 22:09:58–:22:06; BWC2 0:02–1:40:13.

Moreover, Ange does not aver that any delay between the initial incident and his subsequent treatment, including a visit to the hospital, resulted in substantial harm. Questionnaire 13. Instead, Ange points to injuries he suffered as a result of the incident itself. *Id.* Without a showing of substantial harm in connection with the delay, Ange cannot state a claim. *Westfall v. Luna*, 903 F.3d 534, 552 (5th Cir. 2018) (affirming dismissal of plaintiff's denial of medical care claim, where plaintiff "failed to plead any substantial harm that resulted from the officers' [half-hour] delay" calling paramedics); *Haddix v. Kerss*, 203 F. App'x 551, 553 (5th Cir. 2006) ("[Prisoner] has not shown that he faced a substantial risk of serious harm from the occasional denial of pain medication . . . . The result of the defendants' actions was unrelieved, pre-existing, back and shoulder pain, not a worsening of his condition or other serious harm." (internal quotation marks omitted)); *Drumm v. Valdez*, No. 3:16-CV-3482-M-BH, 2019 WL 7494443, at *8 (N.D. Tex. Dec. 3, 2019) (finding prisoner failed to state viable claim based on an alleged delay in care, where although nurse examined a deep laceration to his elbow and only provided basic care, the next day medical personnel sutured the wound and prisoner claimed no substantial harm in connection with the delay), *R. & R. adopted by* 2020 WL 85163 (N.D. Tex. Jan. 6, 2020); *Searcy v. Cooper*, No. 3:01-CV-0112-D, 2001 WL 435071, at *3 (N.D. Tex. Apr. 20, 2001) (concluding detainee had failed to state actionable claim based on a delay in medical care, where he had "not alleged that his condition worsened during the relatively short delay").

---

there is a file-mark that contains a reference to "20190927_8_59," which likely denotes the date and time the footage began recording—i.e., 8:59 p.m. on September 27, 2019.

For these reasons, the undersigned recommends the district judge dismiss Ange's deliberate indifference to serious medical needs claims.[8]

### C. Ange's claim of excessive force against Trooper Sims survives preliminary screening.

Ange's use of force claim arises under the Fourth Amendment because he sustained an alleged injury when Trooper Sims effectuated his September 27, 2019, arrest. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Today we make explicit what [has been] implicit . . . and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."); *Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999) (holding that plaintiff asserted a valid Fourth Amendment claim where he alleged defendant maliciously choked him after arresting plaintiff and searching his vehicle, but prior to transporting him to jail). To sufficiently state an excessive force claim, an arrestee must show that he suffered: "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)).

"The objective reasonableness of the force . . . depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). In evaluating the objective reasonableness of an officer's use of force, courts consider the following non-exclusive criteria,

---

[8] In passing, Ange vaguely claims that, "to [his] knowledge," LCDC officials failed to fill two prescriptions he received at UMC. Compl. 4; Questionnaire 11. Ange, however, names no defendants in connection with this allegation (*see* Compl. 3–4; Questionnaire 11), and he concedes that he did not ask LCDC officials to fill the prescriptions—instead, he alleges that as "a ward of the state or county it[] [was] no longer [his] responsibility." Questionnaire 11. Ange does not contend he suffered any particular injury as a result of not receiving prescribed medication. *Id.* Ange's failure to plead any facts demonstrating a particular LCDC official was aware of and disregarded an excessive risk of harm to Ange's health is fatal to his claim. *See, e.g., Brewster*, 587 F.3d at 770.

11

known as the *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Darden v. City of Fort Worth*, 880 F.3d 722, 728–29 (5th Cir. 2018) (quoting *Graham*, 490 U.S. at 396). An arrestee must allege more than de minimis injury to justify an excessive force finding, and the injury "must be evaluated in the context in which the force was deployed." *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (citing *Williams*, 180 F.3d at 703).

Ange concedes that when Trooper Sims and Agent Smith attempted to execute a traffic stop, he fled from the officers on his bicycle. *See* Questionnaire 4. Ange maintains, however, that Trooper Sims hit him "with the front driver side of [Sims's] SUV in an attempt to stop [Ange]" from fleeing.[9] *Id.* at 2. Ange contends that as a result of the incident, his "left humerus ripped thru [sic] [his] skin," and he now "lose[s] feeling in [his] left arm" and has "continuous severe back pains." Compl. 4; Questionnaire 2, 4.

Accepting as true the foregoing allegations, Ange has pleaded facts demonstrating that he suffered an injury that resulted from Trooper Sims's purported use of force.[10] The Court therefore turns to the objective reasonableness prong and an evaluation of the *Graham* factors.

Trooper Sims and Agent Smith were apparently attempting to stop Ange for mere traffic infractions. Although Ange's subsequent actions—fleeing on his bicycle and ignoring Trooper Sims's orders to "stop"—escalated the gravity of the circumstances surrounding the incident, and the degree of force appropriate under those conditions, Ange had, at best, only committed simple

---

[9] Due to the angles of the cameras--including body and dash cameras—the video footage does not clearly refute Ange's contention. The Court therefore accepts as true, as it must at this stage, Ange's allegation that Trooper Sims hit him "in an attempt to stop" Ange. Questionnaire 4; *see* Compl. 4.

[10] Whether Ange's left humerus in fact "ripped thru" his skin remains to be proven; however, the authenticated records do confirm a laceration severe enough to require an ER visit and sutures to close. As a result, the Court must similarly accept as true Ange's injury claim because the records do not clearly refute his assertion.

traffic violations—failing to stop at a red light and not having a rear light on his bicycle. *See Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("[Plaintiff] was stopped for a minor traffic violation . . . making the need for force substantially lower than if she had been suspected of a serious crime."); *Molina v. Collin Cnty.*, No. 4:17-CV-00017, 2017 WL 5441833, at *3 (E.D. Tex. Nov. 14, 2017) (concluding the first *Graham* factor favored arrestee, where officers had not witnessed him commit a crime and arrestee was merely a suspect to a crime); *see also Brown v. Lynch*, 524 F. App'x 69, 80 (5th Cir. 2013) (per curiam) (applying *Graham* factors and noting that first factor favored plaintiff, where defendant detained him on "suspicion that he had sold marijuana on some prior date—not a trivial offense, but also not one to put any person in real or immediate danger"). The Court therefore finds that the first *Graham* factor favors Ange.

As to the second factor—Ange's immediate threat to officer or public safety—Ange has alleged no facts, either in his Complaint or questionnaire responses, that show he posed a threat to the officers or others, or that he was involved in a violent or serious crime. Thus, this factor also supports a finding for Ange at the screening stage. *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016); *Molina*, 2017 WL 5441833, at *4.

In contrast, the undersigned finds the third factor weighs in favor of Trooper Sims. The video reflects, and Ange acknowledges, that he fled from Trooper Sims and Agent Smith. Questionnaire 4; BWC 0:10–:57. And after fleeing, Ange continued to ignore Trooper Sims's commands to "stop." BWC 0:10–:57. Ange's active flight and refusal to comply with orders justified some degree of force by Trooper Sims. *Cf. Griggs v. Brewer*, 841 F.3d 308, 313–14 (5th Cir. 2016) (rejecting plaintiff's argument "that he was not resisting, but merely lost his balance" because given the circumstances—"a late-night traffic stop involving a clearly drunk and obstinate individual, lurching to the side"—"would, to a reasonable police officer, amount to resistance to

arrest"); *Omokaro v. Whitemyer*, No. 98-10903, 1999 WL 1338438, at *2 (5th Cir. Dec. 30, 1999) (observing that "even by [plaintiff's] account, a reasonable officer could have perceived his reaction to the mace-rolling around, screaming and yelling-as threatening or resisting arrest in such a way as to demand physical force to handcuff him").

Ultimately, "[h]owever, officers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Deville*, 567 F.3d at 167 (internal quotation marks and citation omitted). The Court cannot conclude, at this stage, that Trooper Sims's alleged intentional use of his vehicle to stop Ange from fleeing on his bicycle in response to a traffic stop amounted to a reasonable use of force under the circumstances. Thus, the undersigned recommends that the district judge order Trooper Sims to answer as to Ange's excessive force claim.

### III.   Recommendation

For these reasons, the undersigned recommends that the United States District Judge dismiss with prejudice all of Ange's claims except one for excessive use of force against Trooper Michael Sims. The undersigned recommends that the United States District Judge order Trooper Sims to answer or otherwise plead to that claim.

### IV.   Right to Object

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination

is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: December 16, 2021.

D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE